● **ORIGINAL** ●

IN THE UNITED STATES DISTRICT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BEVERLY BEAM** | ) | CIVIL ACTION LAW |
| | ) | |
| Plaintiff | ) | 1:CV-01-83 |
| | ) | |
| vs. | ) | J. McClure |
| | ) | |
| **SCOTT DOWNEY, ROGER MORRISON, DAVID GRAYBILL AND MICHAEL SWEGER** | ) | JURY TRIAL DEMANDED |
| Defendants | ) | |

### PLAINTIFFS BRIEF IN OPPOSITION TO DEFENDANT MORRISON'S MOTION TO DISMISS

**I.   BACKGROUND**

On or about January 16, 2001 the plaintiff filed her Civil Rights complaint. The defendant Morrison subsequently filed a motion to dismiss. This brief is in opposition to that motion. Morrison is the favorite of favorites to Downey and the IU. Downey helped Morrison write an advertisement for the Upper Dauphin Sentinel. That was done to boast Morrison's "unloaded" miles, a real money maker. An IU driver, Mary Lutz, it has recently been learned, was not dismissed after all. She was just abused. Her run, which started at 4th Street in Harrisburg, was given to Morrison. It now starts in Halifax from Harrisburg. Meanwhile she is sent North to

1

Halifax. The end result is that a Harrisburg Child rides much longer in the afternoon. The purpose was simply to give Morrison a run so he could make more money. But other favors were thrown Morrison's way by Downey. Attached hereto and made a part hereof is Exhibit "A" a letter circulated to IU Superintendents in November 2000 about some of that alleged favoritism. Though this document is not an affadavit, a review of its representations has revealed that though it is grossly incomplete as a history, it is accurate. Each time anyone seeks information about those issues at the IU they confront a stone wall. The allegations against Morrison derive from the conspiracy he and Downey, and undoubtedly other IU officials, have entered into to direct business to him at the expense of others like the plaintiff. The allegations of the complaint are specific. They are incorporated herein.

**II      ISSUES**

Did plaintiff make out a claim against Morrison for:

1.) A due process violation?

2.) Equal protection claim?

3.) An anti-trust violation?

4.) A state claim of civil conspiracy?

## III   ARGUMENT

Factually, defendants got together and decided to follow a course of conduct designed to drive the plaintiff out of business. Morrison was at the forefront of that scheme. As an independent contractor with the Capital Area Intermediate Unit (IU). Plaintiff transported special need's children for a living. Morrison conspired with Downey and others to take the plaintiff's runs (transportation routes for pay) and thus reduce her business to a bare minimum. As part of the process of injuring the plaintiff, the defendants conjured up a wheel chair van scheme. The idea was to force each independent contractor to buy two wheel chair vans (an extremely expensive proposition) and to do so regardless of need, whether real or prospectively. For someone with 1, 2, or 3 runs per day, like plaintiff, this was a financial hurdle of hiatal proportions. But for someone with many runs this was of little consequence, besides, the defendants saw that such persons got wheel chair runs through the IU even if it meant grounding one of their own vans as they did for Mr. Morrison in the case of a Harrisburg run. It is also believed that the defendant Morrison and Downey conspired to exclude black person drivers for Morrison and also to ensure the drivers for Morrison would originate their runs in the Northern part of Dauphin County to maximize miles. These actions constitute outrageous and arbritary violations of the rights of the group (or class) of small independent drivers

like plaintiff. All defendants argue that no property interest nor any liberty interest was implicated in what the defendants allegedly did. That isn't so. The whole wheel chair scheme began before the plaintiff and others like her accepted their contracts and undertook the prodigious and draining task of buying wheel chair vans. After the plaintiff bought a van, this nefarious plan had cost here and others like her, thousands of dollars. She and her husband actually purchased a 1998 Oldsmobile Silhouette van in order to comply with the game defendants were playing. Isn't the fraudulently induced commitment to an otherwise unnecessary debt and the loss of money to satisfy a misleading and unnecessary requirements of a government contract put in place for unlawful reasons directed at plaintiff, not a violation of her liberty and property interests? Plaintiff believes it is.

### A.) <u>DUE PROCESS</u>

Defendants argue that the plaintiff has suffered no due process violation. The boundaries of what a due process violation is, must be decided on almost a case by case basis, the current Supreme Court directing that recourse to more specific violations of more specific Amendments or clauses being preferable to use of the due process clause in a general way. The touchstone of a due process violation is the arbitrary or capricious application or use of government power in the absence of any reasonable government objection. <u>County of Sacramento v. Lewis, 523</u> U.S.

833 (1998). Daniels v. Williams, 474 U.S. 327 (1986). The egregious misconduct engaged in must rise to the level of constitutional violations and, ideally at least, should implicate the deprivation of some other constitutional interest (such as a right to contract or a loss or destruction of property). Here the plaintiff was, like those similarly situated, cruelly and insidiously manipulate to buy at least two vans and convert them to wheel chair vans just to sit and be available in her driveway and for no other use. This was a fraud and was a deliberate stunt designed to force many small operators out ( so that defendants and particularly Morrison could get business). By the time this ludicrous and totally arbitrary policy was dropped, many of the contractors had made purchases of totally unnecessary equipment at great personal expense as a price for being retained as contractors. Plaintiff was one. This planned attempt to destroy the life long business of innocent businessmen and women in order to make more money for a small group of defendants like Morrison, Graybill and Sweger is certainly an egregious application of government power designed to force competitors of these defendants out of business because Downey and these defendants knew that there was no above board, decent, honest, lawful way to make these time proven small business persons quit their proficient delivery of services to the IU short of altering, in a select way, the terms and conditions of their contracts to make it impossible for them to continue. Defendants also imply

that they aren't state actors, but allegations of their working directly with Downey ( who is a state actor as Transportation Director for the IU) is expressly made in the Complaint, see ¶ 's 15, 17, 18, 19, 21, 22, 23, 27, 33, and 36. Thus the private defendants, are, for the purposes of §1983, state actors. <u>Adickes v. Kress,</u> 398 U.S. 144 (1970), <u>Lugar v. Edmundson Oil Co. Inc.,</u> 457 U.S. 922 (1982). The defendants' flirtation (never stated as an issue) with the defendants not being state actors cannot be taken seriously given the allegations of the complaint as aforementioned.

### B.) <u>EQUAL PROTECTION</u>

The essence of an equal protection violation is for the government to selectively discriminate against similarly situated persons who, but for the deprivation would interact with the government in some way. That is precisely the case here. This is not a "suspect category" case. The small IC's constitute a cognizable distinct group. One cannot, as a government actor like Downey selectively apply in such drastic fashion one set of rules to one part of a group intending to harm them on a matter affecting a life occupation without running afoul of the Commerce Clause.

### C.) <u>ANTITRUST</u>

The defendants also misinterpret the understandable !st Amendment concerns meant to protect private persons from soliciting policy changes from the government (even policy changes or anti-trust legislation) and consequently the defendants do not correctly apply <u>City of Columbia, et al v. Omni Outdoor Advertising, Inc.</u>, 499 U.S. 365 (1991). Plaintiff alleges that the defendant Downey, a state actor, is working with certain favored contractors to help them monopolize the transportation of special needs children (complaint 15). The defendants are part of the favored group. Downey even spoke to third person about his plans to force the independent contractors (IC's) like plaintiff, out of business. See averments in paragraphs 17, 18, 19, 22, 23, 24, 25, 26, 30, 33, 35, 36, and 39 of the Complaint. The business involved does affect interstate commerce. Millions of dollars flow into Pennsylvania from the federal government to fund education programs including transportation. The IC's and the IU get tax-free gasoline. They move students on inter-state highways and the miles and routes used or abused directly impact on the miles traveled and the cost for transportation and the burden on the transportation system. Such detail need not be pled at this stage in any event. <u>U.S. v. Employing Plasterers Asso.</u> (1954) 347 U.S. 186, 98L.Ed 618 74S.Ct. 452; <u>Crane v. Intermountain Health Care, Inc.</u>, (1980, 10th Cir) 637 F2d 715. Nor is there a required need to numerate

7

the Act, <u>Michigan Gas & Electric Co v. American Electric Power Co.</u> (1966 SD NY) 41 FRD 462. The allegations are not mere conclusions and are in fact quite specific as is plain on their face. Plaintiff has pled an anti-trust violation for defendants' efforts at monopolization and in restraint of trade. Here defendants violated both the provisions of the Sherman Act and the Clayton Act, since , they conspired and acted to monopolize and also to restrain trade. Defendants can't avoid liability for anti-trust violations simply because one party to the conspiracy is a government official. Such a situation does not confer immunity on private defendants.

### D.) CIVIL CONSPIRACY

In <u>Boyanowski v. CAIU,</u> 215 F. 3d 396 (3d Cir 2000) the Third Circuit opined that the Supreme Court of Pennsylvania would hold, if given the opportunity, that without an underlying tort, a state claim for civil conspiracy would not be in order. The Honorable Sylvia Rambo, in the underlying case had quite correctly held that there was no case law to indicate that a separate tort for conspiracy could not stand alone in Pennsylvania. Indeed situations are quite common - particularly under the criminal law - where conspiracy can stand alone as a charge. But that doesn't matter here though. What is evident here is that there is an allegation of an underlying number of constitutional torts (substantive due process and privileges

8

and immunities) and breach of contract or perhaps "tortious interference with contract," that would support civil conspiracy as a tort here.

**WHEREFORE** defendants' Motion to Dismiss should be denied.

Respectfully Submitted,

_____
Don Bailey PAID# 23786
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500

November 11, 2000

Dear Superintendents of CAIU,

    The following information is being provided in an attempt to direct your attention to some serious concerns within the CAIU Transportation Program. The goal of this letter is to provide some insight into the term "Loaded" and "Unloaded" miles. It would also be helpful to you to understand how contractors *determine* routes. You will notice that *one contractor* has realized significant business growth.

LOADED/UNLOADED MILES

<u>Unloaded Miles</u> – Mileage incurred by a vehicle in completing a scheduled route, run or trip when there are no assigned pupils aboard.

<u>Approved Miles</u> – The total unloaded miles is not to exceed the total loaded miles. When unloaded miles exceed loaded miles, <u>state reimbursement is reduced</u>.

<u>"Upside Down"</u> – A term used frequently by the transportation staff to identify contracted and/or CAIU bus routes where the unloaded miles exceed loaded miles.

<u>Route Assignments</u> – The transportation supervisor gives contractors a list of students in the order of recommended pick up. Contractor determines which driver to assign to the route starting at driver's residence. Contractors could take this as an opportunity to inflate total miles by assigning routes to drivers who live the greatest distance from the first pickup.

This may explain why a help wanted ad (enclosed) for school van drivers appeared in the Upper Dauphin Sentinel, September 26, 2000. The CAIU's largest bus contractor, Roger Morrison, placed the ad to recruit drivers. This ad also states average workweek 30+ hours, overtime available. Does Morrison have lucrative routes in order to be able to offer overtime? This contractor resides in Millersburg with the majority of his work assignments in the general Harrisburg area.

Exhibit "A"

Morrison's company provided 3 vehicles in 1993. By 1995, it was up to 5 and at present, is estimated to be 20 or more vehicles. Why is Morrison allowed to grow so rapidly after testifying at trial for the CAIU? Morrison apparently has special access to staff, use of the CAIU office facility, computers, telephones, office supplies and secretarial assistance. Why is Morrison not hiring his own staff, buying his own equipment and being allowed to use taxpayer dollars to run his own bus company? Is this not a violation of the use of taxpayer dollars? Additionally, sources have revealed that Morrison gets to pick and choose which students he wants to transport.

In the <u>spring of 1999</u>, Morrison placed wheelchair vans in use during that current school year. All other CAIU contractors were notified at a CAIU meeting during June, 2000, that the contract would require them to purchase wheelchair vans (plus spares) before the end of the 2000-01 school year. This announcement caused some contractors to resign. Morrison had a <u>jump</u> on the other CAIU contractors to purchase wheelchair vans. Why would any contractor with a <u>year to year</u> contract make such a sizeable investment unless he had some guarantee or was aware of inside CAIU information?

There certainly is no real urgency for this added expense to independent contractors since the CAIU presently owns sufficient wheelchair buses, which are sitting idle at the Summerdale office and other areas of the CAIU. Some of these wheelchair buses are dormant due to one large district purchasing 4 wheelchair buses and reclaiming their students to transport during the 1999-2000 school year. Other buses were idled because another large district withdrew their students from the CAIU transportation. How many wheelchair bound students is the CAIU actually transporting?

At a recent CAIU board meeting, the transportation officer reported <u>that at least five school districts withdrew transportation needs</u> from the CAIU. Since the transportation budget is prepared based on student enrollment, have you requested an actual accounting of the number of pupils transported for each participating district for the school years 1999-2000 and 2000-2001, in real numbers?

Below you will find several examples of the widespread problem of <u>upside down</u> CAIU bus routes:

- Contractor A reported that a vehicle travels 191 unloaded and 72 loaded miles daily.

- Contractor B reports that a vehicle travels 144 unloaded and 112 loaded daily miles.

- Contractor C reports that during a midday trip, one student traveled 10 miles while the unloaded miles for the van was 120 miles.

- Contractor D reported daily miles of 74 unloaded and 3 miles loaded to transport preschool students to a class in Millersburg.

- Morrison was assigned a summer school route during 2000. This route was to transport students from the Paxtonia area, Central Dauphin School District, to and from a school in Hershey. Sources reveal that the driver assigned resides in the Carlisle area. From what location was the beginning mileage recorded (Carlisle or Millersburg)? This is a clear example of upside down unloaded miles exceeding actual loaded miles.

- CAIU wheelchair bus #591 route was abolished by the Transportation Department on or about October 30. It transported 4 students (3 wheelchair bound). The students were shifted to 2 contracted carriers with wheelchair vans. A Harrisburg student to be transported to Susquenita was given to Morrison, a Millersburg resident. Another student to be transported from Mechanicsburg to Susquenita was assigned to a Boiling Springs contractor.

- Meanwhile, the CAIU wheelchair bus #591 (above) was given a new run on or about October 30. The driver (residing in Penbrook) picks up the first child (ambulatory - Student #1) in Harrisburg and travels to Halifax High School, unloads, then travels empty to Millersburg to transport a wheelchair bound child (Student #2) to a school in Elizabethville, Upper Dauphin School District. After unloading, the driver then travels empty back to Millersburg; picks up another ambulatory student (Student #3) for transport to Middle Paxton School, located in Dauphin Borough and

travels _empty_ to Penbrook. This is another example of "upside down mileage". The afternoon bus #591 travels to Halifax High School empty and picks up Student #1 and proceeds north to Elizabethville to pick up Student #2. The bus then travels to Millersburg to unload Student #2 and finally travels directly to Harrisburg to unload Student #1. The Harrisburg student is in the vehicle approximately an _extra 30 minutes every day_. Is it wise to assign the Harrisburg student (travelling to Susquenita) to a Millersburg contractor while a Penbrook driver is sent to Millersburg at the expense of a child who spends an extra 2½ hours weekly in the vehicle.

- In a _field trip_ from Oak Flat Elementary, Big Spring School District, to Mechanicsburg area, the CAIU dispatched two contracted wheelchair vans for the trip. One van from Dillsburg and a van from Boiling Springs. In the past, one CAIU bus (with sufficient capacity) had been used. It took _two small vans to replace the CAIU bus?_ The contractors were paid total miles round trip from their home base for this field trip. Clearly another example of "upside down mileage". How are costs reduced, as reported by the transportation department, in cases like this?

It appears that some contractors receive preferential treatment. Care is not taken to assign students to drivers based on the student address, consequently resulting in _greater upside down miles_. _Some contractors benefit at the expense of children riding excessive distances_. These problems have been ongoing. A review of the 1999-2000 bus rosters and other data will reveal that this has been a continuing practice.

An evaluation of all CAIU bus rosters will reveal how many CAIU buses were dormant during the 1999-2000 school year and how many sat idle this term. CAIU buses (already paid for) sit idle while contractors are assigned to students at higher taxpayer expense.

After you have reviewed this information, I urge you to seek and investigate the authenticity of this letter. I hope you would place the best interest of the students and taxpayers first.

                                            Thank you.

B10  The Upper Dauphin Sentinel • September 26, 2000

**ACCOUNTING/BOOKKEEPING:** Full time position, in-depth accounting, payroll, monthly financial reporting, automotive titling skills, general office duties, computer literate, competitive wages. Klinger Chevrolet Inc., Sacramento. 570-682-3141 or fax resume to 570-682-8369.
9-19-TF

**ELECTRICIANS** needed for immediate employment. Must have commercial experience. Excellent wages and benefits. Please call Spectron Inc. (717) 932-1000.
9-26-2p

**SUBSTITUTE TEACHER.** Certified substitute teacher needed for Secondary English, elementary and all other subjects for secondary. Send letter of interest, application, resume, copy of PA cert., transcripts, and Act 34 and 151 clearances to: James Dull, Superintendent, Halifax Area School District, 3940 Peters Mountain Road, Halifax PA 17032. Application deadline Thursday, September 28, 2000. E.O.E.
9-26-1t

**SCHOOL VAN DRIVERS.** Van drivers needed to transport special needs children and pre-school aged group children. Average work week 30+ hours, overtime available. Wages based upon experience. Earn $8-$10 hourly. No CDL required. 5-7 weeks off summer months. Company pays for all background checks and physicals. Call Morrison & Sons Inc. Transportation Services, evenings (717) 692-4222, days (717) 576-1831.
9-26-2t

Part time **SALES HELP.** Wednesday evening & 3 Saturdays per mo. 365-3101.
9-26-1t

**FULL TIME HELP** wanted by property maintenance company. Must be reliable. Some experience helpful. Please call 896-3707 after 6:30 p.m.
9-26-2t

**2nd Shift CUSTODIAN & SUBSTITUTE CUSTODIANS NEEDED:** Full time position available 12/27/00 at the Williams Valley School District, Tower City. Responsibilities include cleaning and maintenance of building and grounds, snow removal and security of building. Salary $8 per hour plus benefits. Position requires willingness to work additional hours, every 3rd Saturday. Substitute custodians needed for all shifts. Salary $7.75 per hour. Applications are available at the District Office or by calling 717-647-2167. Applications will be accepted until positions are filled.
9-26-3t

**CLEANING/JANITORIAL PERSON.** Dependable person to clean offices in Millersburg, 3-5 hours, 5 nights/week after 5 p.m. Good pay and flexible hours. Call 938-4344.
9-26-1t

**NEWSPAPER DELIVERY:** Immediate openings now for home delivery routes in the Elizabethville area. Earn great profits for a few hours work early in the morning. Call Sheryl Leggore, 1-800-692-7207 ext. 8421 for more information. Don't miss this great opportunity.
9-26-2t

**NOW HIRING:** Petra Fashions Home Lingerie & Sleepware shows. Earn $25/hour. Free training! Free start-up kit. Call Sharon 717-642-8775.
9-26-3p

**PART TIME TELLERS NEEDED,** Community Banks, N.A., Millersburg and Halifax offices are seeking professional, team-oriented individuals with excellent customer service skills to work approximately 16 to 20 hours per week including Saturday mornings. We offer competitive wages, 401(K), paid vacation and in-house training with the ability to advance within the organization. Stop in at either office for an application: E.O.E. M/F/H/V.
9-26-1t

**COMPUTER, INTERNET** people wanted to work online. $125-$175 an hour. FULL TRAINING. Vacations, bonuses and incentives. Bi-linguals also needed. 4 countries. FREE E-BOOK: www.ProfitPC.net
9-26-PennScan

**DRIVER:** Koppy's Propane Inc. is growing and needs driver for bulk truck deliveries. Must have 2 years experience with Class B, Haz-Mat, air brake and tanker endorsements. Also, must have clean DMV record, be very safety oriented and attentive to details. We offer a competitive wage, holidays, vacation, insurance, and 401K. Full time or part time. Contact Randy Witmer at Koppy's Propane for application (717) 647-7111.
9-26-2t

**DRIVER:** Koppy's Propane Inc. is growing and needs driver for tractor trailer. Must have 2 years tractor trailer experience. Class A with Haz-Mat, air brake and tanker endorsements. Also must have a clean DMV record, be very safety oriented and attentive to details. We offer a competitive wage, holidays, vacation, insurance and 401K. Full time or part time. Contact Randy Witmer at Koppy's Propane for application, (717) 647-7111.
9-26-2t

**MANAGER OPPORTUNITIES - HICKORY FARMS** has seasonal manager openings in a mall near you. Easy training programs, competitive salary, bonuses, 40% employee discount. Call 1-800-228-8229 EOE.
9-26-PennScan

**FRIENDLY TOYS & GIFTS** has openings for party plan demonstrators & managers! Home Decor, Gifts, Toys, Christmas. Earn cash, trips, recognition. Free catalog. Information 1-800-488-4875.
9-26-PennScan

**CAREER OPPORTUNITY.** Earn Up To $45,000 per year processing medical Claims. Full Training provided. Computer required. Call Titan Toll-free! 888-660-6693 ext. 4317.
9-26-PennScan

**$925 WEEKLY POTENTIAL.** Make money Helping People. Receive Government Refunds. free details! (24 hr. recorded message) 1-800-449-4625 Ext. 5900. $48 investment
9-26-2t

**Drivers — COVENANT TRANSPORT** Coast to Coast Runs, Teams Start up to 46¢ $1000 Sign-On Bonus for Exp. Co. Drivers for experienced Drivers 1-800-441-4394. Owner operators 1-877-848-6615 Graduate Students: 1-800-338-6428
9-26-PennScan

**DRIVERS NEEDED** 99% SAME DAY RELOAD. Late Model KW tractors, great miles, 99% no-touch freight. Must have 1 yr. OTR. Call Dave or Jennifer today! 1-800-201-4782.
9-26-PennScan

**MEDICAL.** Earning potential up to $20,000-$45,000/yr. Dr's need people to process claims. We train. Must own computer/modem. Call 800-537-1638 x 804.
9-26-PennScan

**$505 WEEKLY POTENTIAL.** Working for the Government parttime. No experience required 1-800-748-5716 Ext. X108. Investment $35-$85.
9-26-PennScan

More Help Wanted — Next Page

**INSURANCE**
**Medicare Supplement Agents Needed**
Due to the HMO disenrollments and the market demand, we need licensed agents to distribute our products.
• Independent Agency
• Quality & competitive products
• Daytime hours
• Advance Commissions
• Leads! Leads! And more leads!!
• Great opportunity now and for the future
Call Cindy 1-800-642-3490

**SALES POSITION**
at
*Leitzel's Jewelry*
in Millersburg.
— Must apply in person —
Call 692-2474 to make appointment

## CERTIFICATE OF SERVICE

I hereby certify that on this **18th DAY OF APRIL 2001**, a true and correct copy of the foregoing **Document** was served upon the following counsel of record by United States Mail, postage prepaid:

**Melinda B. Kauffman, Esquire**
**Stock and Leader**
35 S. Duke Street
P.O. Box 5167
York, PA 17405-5167

**Steven Schiffman, Esquire**
**Serratelli, Schiffman, Brown and Calhoun, P.C.**
2080 Linglestown Road
Harrisburg, PA 17110

**Daniel P. Altland, Esquire**
**Mette, Evans and Woodside**
3401 N. Front Street
Harrisburg, PA 17110

BY: _____
Don Bailey ID# 23786
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500