(48)
1/22/03

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BEVERLY BEAM,                         :
                                      :    CIVIL ACTION LAW
            Plaintiff,                :
                                      :    Docket No.: 1: CV-01-0083
      v.                              :
                                      :    (Judge McClure)
SCOTT DOWNEY, ROGER                   :
MORRISON, DAVID GRAYBILL,             :
and MICHAEL SWEGER,                   :
                                      :
            Defendants.               :

FILED
HARRISBURG, PA

JAN 2 1 2003

MARY E. D'ANDREA, CLERK
Per _____
         Deputy Clerk

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION
## FOR ATTORNEYS' FEES AND COSTS UNDER 42 U.S.C. §1988

## I.    FACTUAL AND PROCEDURAL HISTORY

The facts and procedural history are well known to the Court and Counsel

and will not be repeated in their entirety.

Plaintiff, Beverly Beam filed this Complaint on or about January 16, 2001,

which was dismissed upon Defendants' Motion to Dismiss pursuant to Fed. R. Civ.

P 12(b)(6).  Defendants then filed a joint Motion to Enlarge Time to File for

Attorneys' Fees and Costs on April 24, 2002, which the Court granted on May 30, 2002. Plaintiff then filed her Notice of Appeal on April 16, 2002. On December 23, 2002, the Third Circuit Court of Appeals affirmed the District Court. Defendants Graybill and Sweger filed their Motion for Attorneys' Fees and Bill of Costs on January 6, 2003 and now file this Brief in Support of their Motion.

## II.   STATEMENT OF ISSUES PRESENTED

1.   Should Defendants' Graybill and Sweger be awarded attorney's fees and costs under 42 U.S.C. §1988?

(Suggested Answer: yes)

## III.   ARGUMENT

"In any action or proceeding to enforce a provision of sections 1983[], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. §1988(b). "A plaintiff may be liable for attorneys' fees under §1988 when a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly becomes so." Brown v. Borough of Chambersburg, 903 F.2d 274, 277(3d Cir. 1990), citing Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 422, 98 S.Ct. 694, 701 54 L.Ed.2d 648 (1978).

"The Plaintiff's action must be meritless in the sense that it is groundless or without foundation." Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178 (1980). "Implicit in this approach is the premise that Plaintiff knew or should have known the legal or evidentiary deficiencies of his claim." Brown, supra at 277

Plaintiff filed her Complaint on January 16, 2001 alleging violations of her substantive due process and equal protection rights and violation of antitrust laws. Plaintiff also alleged pendent state claims of civil conspiracy and breach of contract. These claimsHu

were brought against each Defendant, including private citizens David Graybill and Michael Sweger. Defendants thereafter filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative for a More Definite Statement pursuant to Fed. R. Civ. P. 12(e).

By Order and Memorandum dated April 10, 2002, Plaintiff's Complaint was dismissed under Fed. R. Civ. 12(b)(6). "In reviewing a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations of the complaint and draw all reasonable inferences in the light most favorable to the plaintiff." (Mem. Op., p.2), citing Bd. of Trs. of Bricklayers & Allied Craftsmen of Local 6 of New Jersey v. Wettlin Assoc., Inc., 237 F.3d 270, 272 (3d. Cir. 2001). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." Ramadan v.

Chase Manhattan Corp., 229 F.3d 194, 195-96 (3d Cir. 2000), citing Alexander v. Whitman, 114 F.3d 1392, 1398 (3d Cir. 1997).

To set forth a claim under 42 U.S.C. §1983, Plaintiff had to allege and prove that Defendants, acting under color of state law, deprived her of her equal protection and/or due process rights. See Labalokie v. Capital Area Intermediate Unit, 926 F.Supp. 503, 506 (M.D. Pa. 1996). Defendants Graybill and Sweger are transportation contractors like Plaintiff, not state officials. In this Court's Memorandum dated April 10, 2002, Plaintiff's claims under 42 U.S.C. §1983 were dismissed as to Graybill and Sweger because Plaintiff failed to allege any specific agreement between them and the other Defendants to violate her constitutional rights. (Mem. Op., pp. 9-10). In construing Plaintiff's Complaint in the light most favorable to her, this Court determined that she was attempting to allege "a deprivation of a protected property interest in the form of lost mileage due to a decrease in the transportation ranks assigned to her pursuant to her contract as a driver with CAIU". (Mem. Op., pp. 10-11). Plaintiff, however, had no property interest in her contract with the CAIU. See Labalokie, supra, at 508. In light of Plaintiff's failure to allege that Graybill and Sweger were acting pursuant to an agreement with the other Defendants, in particular Downey, and/or that she had a property interest worthy of protection, this Court stated, "[t]here is no discernable claim of substantive due process violation." (Mem. Op., p. 16).

With regard to Plaintiff's equal protection claim, to succeed, she had to "prove the existence of purposeful discrimination and demonstrate that [s]he received treatment different from that accorded other individuals similarly situated." Wood v. Rendell, Civ. A. No. 94-1489, 1995 WL 676418, at *4 (E.D. Pa. Nov. 3, 1995) (internal citations omitted). Plaintiff failed to do so. In fact, Plaintiff stated within her Complaint that all independent contractors were required to purchase at least two wheelchair vans. Further, Plaintiff, under the standard set forth in Wood v. Cohen, failed to allege that she was a member of a protected class. See Wood v. Cohen, Civ. A. Nos. 96-3707, 97-1548, 1998 WL 88387, at *8 (E.D. Pa. March 2, 1998), aff'd, 205 F.3d 1331 (3rd Cir. 1999) In dismissing Plaintiff's §1983 equal protection claims, this Court stated "Plaintiff does not even remotely state facts sufficient to support a prima facie claim." (Mem. Op., p. 18).

As to Plaintiff's only other federal claim, an antitrust violation claim, the standard for dismissal is such that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles . . ." Poller v. Columbia Broad Sys., 368 U.S. 464, 473 (1962). Plaintiff, though, failed to even set forth a specific federal or state antitrust statute upon which to base her conclusory claim. Therefore this claim also was dismissed as meritless even under the heightened Poller standard of review.

Plaintiff's pendent state claims of civil conspiracy and breach of contract were also dismissed by the Court. In order to properly plead a claim of civil conspiracy, one must allege an underlying tort, which Plaintiff failed to do in her Complaint. (Mem. Op., p. 20). Finally, because Plaintiff did not allege that she was a party to a contract with Graybill and Sweger, her breach of contract claim was also dismissed. (Mem. Op., p. 22).

On April 16, 2002, Plaintiff filed her Notice of Appeal to the Third Circuit, thereby appealing the District Court's decision to dismiss her cased under Fed. R. Civ. P. 12(b)(6). On December 23, 2002, the Third Circuit Court of Appeals issued and Opinion and Judgment, affirming the District Court's dismissal of Plaintiff's Complaint. This Opinion of the Court was entered without oral argument of the parties and states that "Beam's arguments are meritless."

If a court finds that a plaintiff's claims are frivolous, unreasonable, meritless, or without foundation, the plaintiff may be liable for attorneys' fees to defendant under 42 U.S.C. §1988. See Brown, supra at 277, Hughes, supra 449 U.S. at 14, 101 S.Ct. 173, 178. Furthermore, if a plaintiff continues to litigate her claims after it becomes clear that they are frivolous, unreasonable or meritless, she may also be liable for attorneys' fees to the defendant. See Brown, supra.

Each of Plaintiff's claims, i.e. §1983 equal protection and due process violations, antitrust violations and civil conspiracy, required an agreement between

the Defendants.  The Court dismissed each of these claims because Plaintiff had

failed to allege any sort of agreement between the parties and had not set forth

facts sufficient to support her claims.  Not only did Plaintiff not set forth facts

sufficient to support these claims in her Complaint, she had no knowledge of any

facts to support those claims, as she admitted during her deposition.  (Plaintiff's

Dep., p. 109, attached hereto as Exhibit A)  If Plaintiff did not have any such

information to support her allegations at the time of her deposition, approximately

six months after filing her Complaint, it is safe to conclude that she had no such

information at the time she filed the Complaint either.  Yet despite her admission,

Plaintiff continued to litigate her action against Graybill and Sweger pending this

Court's decision on Defendants' Motion to Dismiss and even thereafter.

Because Plaintiff failed to allege the existence of a specific agreement

between the Defendants, and admitted that she had no knowledge of any such

agreement, her equal protection, due process, and civil conspiracy claims were

frivolous, unfounded and meritless.  Further, Plaintiff's failure to allege a property

interest worthy of protection under the Fourteenth Amendment emphasizes the

lack of merit to her substantive due process claim.  Plaintiff's averment that all of

the transportation contractors were going to be required to purchase at least two

wheelchair vans demonstrates that she was not treated any differently than the

other transportation contractors.  Thus, even if she had alleged a specific

agreement between the Defendants, her equal protection claim was without merit.

Finally, Plaintiff's failure to allege an underlying tort, essential to a civil conspiracy claim, and her failure to allege any specific contract she was a party to along with Graybill and Sweger, makes these claims frivolous and groundless as well.

Based on Plaintiff's inability to set forth facts sufficient to support her claims against Defendants, and her admission that she had no information to support her claims, those claims were groundless and without foundation. In addition, in affirming the District Court's April 10, 2002 Order, the Third Circuit Court of Appeals stated that Beam's arguments were meritless. If the allegations in Plaintiff's Complaint had merit, such that they should not have been summarily dismissed by the District Court on a Rule 12(b)(6) Motion, certainly the Court of Appeals would not have labeled Plaintiff's arguments "meritless." As such, Defendants, as the prevailing party in this action, are entitled to reasonable attorneys' fees.

## VI.    CONCLUSION

For the reasons stated above, Defendants Graybill and Sweger respectfully

request that they be awarded attorneys' fees and costs pursuant to 42 U.S.C. §1988.

Respectfully submitted,

**SERRATELLI, SCHIFFMAN, BROWN**
**& CALHOON, PC**

By

Steven J. Schiffman, Esquire
I.D. No.: 25488
Melanie L. Erb, Esquire
I.D. No.: 84445
Suite 201, 2080 Linglestown Road
Harrisburg, PA 17101
(717) 540-9170
Attorneys for Defendants David Graybill
and Michael Sweger

Dated: 1/21/03

A



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BEVERLY BEAM,                          :
      PLAINTIFF                  :   CIVIL ACTION - LAW
                             :
        V                      :
                             :   NO. 1:CV-01-0083
SCOTT DOWNEY, ROGER                    :
MORRISON, DAVID GRAYBILL,              :
AND MICHAEL SWEGER,                    :
      DEFENDANTS                  :   JURY TRIAL DEMANDED


VIDEO
DEPOSITION OF:  BEVERLY BEAM

TAKEN BY:       DEFENDANT SCOTT DOWNEY

BEFORE:         DONNA E. RICHARDS, RPR
                NOTARY PUBLIC

DATE:           JULY 9, 2001, 10:05 A.M.

PLACE:          SERRATELLI, SCHIFFMAN,
                BROWN & CALHOON, P.C.
                2080 LINGLESTOWN ROAD
                HARRISBURG, PENNSYLVANIA


APPEARANCES:

   BY:  DON BAILEY, ESQUIRE

       FOR - PLAINTIFF

APPEARANCES CONTINUED ON NEXT PAGE



1  replace a vehicle, it has to be at least a nine passenger

2  van.  I believe that's in the new one.

3     Q    But you no longer have -- well, you haven't had a

4  requirement to have a wheelchair van?

5     A    No.

6     Q    Okay.  And you don't this year as far as you know?

7     A    Well, we had it last year.

8     Q    But you don't this year?

9     A    No, we don't this year.

10    Q    And that was never enforced?

11    A    No, it was never enforced.

12    Q    You didn't have your contract terminated because

13 you did not have a --

14    A    No.

15        MR. RUSSELL:  Okay.  I have no more questions.

16                    CROSS-EXAMINATION

17 BY MR. SCHIFFMAN:

18    Q    Ms. Beam, my name is Steven Schiffman, and I'm the

19 attorney for Graybill and Sweger.  And the same instructions

20 that Mr. Russell gave you.  I would just ask you to listen

21 to the question, and if you don't understand, feel free to

22 interrupt me, put your hand up.

23        MR. BAILEY:  Mr. Schiffman, would you mind if I

24 just maybe start a new tape?  It will take me a few seconds.

25        MR. SCHIFFMAN:  Certainly.

1          MR. BAILEY:  This is the end of the Stock and

2    Leader inquiry.  Thank you, Mr. Schiffman.

3    BY MR. SCHIFFMAN:

4      Q    Um-hum.  As I said, if you have a problem or need a

5    break or you don't understand, just feel free to tell me.

6    If you wish to ask Mr. Bailey a question, feel free to do

7    that.

8          And I'm not going to go back through the fine

9    examination of Mr. Russell and just try to clean up a couple

10   of things.  You know Mr. Sweger and Mr. Graybill?

11     A    Yes.

12     Q    And how long have you known them?

13     A    I believe I knew them ever since I started driving,

14   15, 16 years.

15     Q    At least 15, all right.  Now, prior to -- strike

16   that.  One of the runs that you talked about in your

17   examination with Mr. Russell was a run that was taken over

18   by Graybill and Sweger; is that correct?

19     A    Yes.

20     Q    And how long did you have that run prior to them

21   taking that over?

22     A    The exact run?

23     Q    They're never the same every time?

24     A    Yeah.

25     Q    But --



```
 1        A    Well, I've -- I think I had one of the children

 2   seven years.  And the younger ones, maybe four or five

 3   years.

 4        Q    And prior to -- and prior to you having that run

 5   who had the run?

 6        A    I don't know.

 7        Q    Isn't it true Mr. Graybill had that run?

 8        A    I don't know.

 9        Q    You also said that -- that your driver knew sign

10   language or could communicate with the children?

11        A    She -- yes.  She could communicate.  She wasn't --

12        Q    Do you know Mr. Graybill's wife?

13        A    Yes.

14        Q    Do you know that she understands sign language?

15        A    No, I don't.  I was told by Shea Hummel's

16   grandmother that she asked her that question at the

17   beginning of the year, and she said she knew no sign

18   language.

19        Q    How about Mr. Sweger's drivers?  Any of them know

20   sign language?

21        A    I was told by another parent, Toby Stoltzfus'

22   mother, that he did not know sign language either.

23        Q    Did you ever ask Mr. Graybill or Mr. Sweger?

24        A    No, I didn't.

25        Q    Did you ever ask any of the drivers whether they
```

1  knew it?

2      A    No, I didn't.

3      Q    Did you ever ask Mr. Graybill whether he had that

4  run before?

5      A    No, I didn't.

6      Q    Was there one run that you split last year that

7  Graybill and Sweger took the child to school and your people

8  took them home?

9      A    I don't know.  I knew there was one child that I

10  took them to p.m. only.  I don't know how she got to school

11  in the a.m.

12      Q    Is that a deaf child?

13      A    Yes.

14      Q    The child -- when you took the child home, were

15  they upset about their morning ride in?

16      A    I never heard no complaints, no.

17      Q    Now, in June of 19 -- is it '99 or 2000?  June of

18  2000 when you got the notice where the IU unit was asking

19  for volunteers.

20      A    Yes.

21      Q    Did you volunteer?

22      A    No.

23      Q    To get -- do you know whether Mr. Graybill and

24  Sweger volunteered?

25      A    No.

1    Q    Do you know whether the IU unit got any volunteers?

2    A    No.

3    Q    Will you agree with me that there's a need for

4    wheelchair vehicles in the IU unit?

5    A    No, I wouldn't agree to that.  They had IU --

6    Q    Were there children who were in wheelchairs?

7    A    Yes.

8    Q    How would they get to school?

9    A    I assume most of them got to school with the IU

10   busses.

11   Q    Okay.  And if there were no IU busses for it, was

12   there a need?

13   A    Yes.  If there was no IU busses, yes.

14   Q    And if it was cheaper for the IU unit to have

15   independent contractors do it as opposed to the IU unit,

16   would it be a need?

17   A    You talk about being cheaper and saving money --

18   Q    Assume that it is, would it be a need if it was

19   cheaper?

20   A    If it was cheaper, yes.

21   Q    And you have no statistics, or you don't know

22   whether it's cheaper or not?

23   A    No, I don't.

24   Q    All right.  In August when you had the famous

25   Eat-N-Park meeting.

1         MR. BAILEY:  Objection.  You may respond.

2   BY MR. SCHIFFMAN:

3         Q    Was Mr. Graybill and Sweger there?

4         A    Yes.  I believe they both were there.

5         Q    Okay.  And did they participate in that meeting,

6   the drivers?

7         A    They made comments to my husband and myself, yes.

8         Q    What were the comments?

9         A    They said they had merged together to form a

10  company because of the wheelchair requirement.

11        Q    Okay.

12        A    And they --

13        Q    Now, were they trying to respond then to what the

14  IU unit was doing?

15        A    We asked them how they found out the requirements

16  and knew -- knew of it, and they said they found out by

17  accident.  So I -- I believe they knew about it before we

18  got the letter saying that there was a need for them.

19        Q    Is it your understanding that they got the June

20  letter asking for the volunteers?

21        A    Yes.  I assume everybody got that letter, yes.

22        Q    Do you know whether or not they volunteered to get

23  a wheelchair van then?

24        A    No, I don't.

25        Q    Now, after -- after that meeting occurred did the

1    -- did the group get together to hire an attorney?

2      A    No.

3      Q    They didn't -- they didn't attempt to go out and

4 get legal help to do it?

5      A    Not all of us, no.

6      Q    Okay.  Did more than just you?

7      A    We all -- there was a small group that asked for

8 legal advice, and I was the only one that wanted to pursue

9 it.

10      Q    Okay.  Were there other -- who were the other

11 people that asked for legal advice?

12      A    Linda Urich, Pat Yohn, Martina Dumbach, Carmen --

13 Yvonne Carmeny.  I can't -- there was more, but I can't

14 think of --

15      Q    Okay.  Did -- did they, as a group, get together

16 and meet with an attorney?

17      A    Yes, we met.

18      Q    More than just one of you met?

19      A    Just one time, yes.

20      Q    Okay.  And was that with Mr. Bailey?

21      A    Yes.

22      Q    Did -- those other people that met, did they retain

23 Mr. Bailey?

24      A    No,

25        MR. BAILEY:  Objection.  You know, again, you're

1  going to get into -- if he asks you questions, go ahead and

2  answer questions as best you can.  But in terms of meetings,

3  you can't waive other people's privileges also.  But you

4  just have to be very careful about that, and when there were

5  meetings and discussions.

6          Now, if you have talks with people outside the

7  presence of the attorney, you can talk about that or answer

8  those questions.

9  BY MR. SCHIFFMAN:

10     Q    Did they -- did they meet -- did they retain Mr.

11  Bailey?

12          MR. BAILEY:  Objection.  But you can go ahead and

13  respond.

14          THE WITNESS:  Not that I know of, no.

15  BY MR. SCHIFFMAN:

16     Q    Did they pay for the meeting with Mr. Bailey?

17          MR. BAILEY:  Objection.  But you can respond.

18          THE WITNESS:  No, not -- I don't remember what they

19  paid.  I know what I paid.

20  BY MR. SCHIFFMAN:

21     Q    Okay.

22     A    I don't know who paid what.

23     Q    All right.  And you were in the meeting?

24     A    Yes.

25     Q    Now, what was said at the meeting?

1       MR. BAILEY:  That's -- my advice to you would be

2  not to respond to that question.

3       MR. SCHIFFMAN:  Okay.  Just for the record, as far

4  as I can tell from asking Ms. Beam, there was no joint

5  representation at that time.  The other parties had not

6  retained you.

7       The attorney/client privilege doesn't attach in

8  this situation where there is no representation at that

9  point.  So I'm -- and I'm not going to go any further.  I

10  just asked the question.  You've directed her not to answer.

11       MR. BAILEY:  My concern is that she doesn't know,

12  and it's just a better safe than sorry.  If you have some

13  desire to pursue it because you think it's valuable, I

14  wouldn't blame you for that.

15       But, I mean, my advice to her, you know, she has a

16  potential liability problem also.  I think you can

17  understand that.  And that's why I would advise her not to

18  respond.

19       MR. SCHIFFMAN:  Just for the record --

20       MR. BAILEY:  If you want to pursue it, a judge or

21  whatever can take it up.  We can discuss it.

22       MR. SCHIFFMAN:  The foundation is there.  If we

23  need it, we can go through.

24       MR. BAILEY:  Yeah, right.

25  BY MR. SCHIFFMAN:

106

```
 1      Q    When did you get your list of -- of runs for the
 2  year?
 3      A    This past year?
 4      Q    Yes.
 5      A    I'd say approximately a week before school started.
 6      Q    Okay.  And you found out you had two runs; is that
 7  correct?
 8      A    Yes.
 9      Q    How many runs did Graybill and Sweger have?
10      A    I don't know.
11      Q    Well, is Graybill and Sweger -- in your
12  classification that you went through with Mr. Russell, are
13  they a large contractor or a small contractor?
14      A    Being merged together they -- I'm not sure how many
15  runs they have there.  I consider it large.  I have no idea
16  how many runs they have.  If it's --
17      Q    If I told you they had four runs last year, would
18  you consider that a large contractor or small contractor?
19      A    I would consider that small.
20      Q    And if they took one of the four runs and split it
21  in two because of a disciplinary problem, that's still
22  really only four runs, or maybe five runs between the two of
23  them.  Is that a small or a large contractor?
24      A    I would still consider five small.
25      Q    Especially for the two owners that are running it?
```

1   A    Right.

2   Q    So if you take for a second my representation to

3   you that that's what their runs were, started out at four

4   and wound up five because they split a run in half, do you

5   still say for the record that they were able to get

6   preferential treatment in this situation from the IU unit?

7   A    I still believe they did.

8   Q    Tell me what the preferential treatment was.

9   A    Because Marc Bauer made statements that he was

10  going to take care of the ones that bought wheelchair vans.

11  Q    Okay.  How did he take care of them?

12  A    He said he was going to take care of them.  He

13  didn't care if he had to run them across the mountain to

14  give them the mileage to do it.

15  Q    Did they do that?

16  A    Yes.  They give them runs across the mountain.

17  Q    Did they give them -- how many more runs did they

18  give them in that year versus the year prior?

19  A    I don't remember what they had the years before.

20  Q    So you have no facts or no information in your

21  possession that tells you that they did preferential

22  treatment for them; is that correct?

23       MR. BAILEY:  Objection.  You can respond.  It's

24  been asked and answered.  You may respond again.

25       THE WITNESS:  Repeat the question.



BY MR. SCHIFFMAN:

    Q   I'll ask it in another way.  What information do you have that shows that Graybill and Sweger were given preferential treatment for purchasing a wheelchair van?

        MR. BAILEY:  Objection.  Asked and answered.  I'm going to permit you to respond again.  Go ahead.

        THE WITNESS:  I still reply by saying they -- they guaranteed runs with the high mileage.

BY MR. SCHIFFMAN:

    Q   And what runs were those?

    A   The runs with the hearing impaired children.

    Q   The same run that Mr. Graybill had before it was taken by you?

        MR. BAILEY:  Objection.

        THE WITNESS:  I don't know what he had before me.

BY MR. SCHIFFMAN:

    Q   Okay.  If I told you that you took the run that he had previously, all right, do you think that was unfair when you took that run from Mr. Graybill?

        MR. BAILEY:  Objection to the form of the question. You may respond.

        THE WITNESS:  I didn't take that run from him.  I took what the IU assigned to me.

BY MR. SCHIFFMAN:

    Q   And isn't it true that Mr. Graybill and Mr. Sweger

1    got their runs at the same time you got your run last year?

2        A    I don't know when they got theirs.

3        Q    You don't have any information about any

4    conversations between Mr. Graybill and Mr. Sweger with

5    regard to their runs prior to the issuing of the runs at the

6    end of August of last year?

7        A    I don't remember of any conversation.

8        Q    Do you have any information at all as to any sort

9    of communication or any sort of agreement between Mr.

10   Graybill, Mr. Sweger, and Mr. Downey with regard to their

11   runs?

12       A    No.

13       Q    Did you hear from any third person that they have

14   information with regard to Mr. Graybill and Mr. Sweger and

15   Mr. Downey coming in to any sort of agreement with regard to

16   their runs?

17       A    Could you repeat that, please?

18       Q    Have you -- I asked the last question whether you

19   personally knew of any conversations.  Now I'm asking did

20   you hear from any third person that there was -- there were

21   any conversations or any agreements between Mr. Sweger and

22   Mr. Graybill with regard -- and Mr. Downey with regard to

23   their runs and getting more runs?

24       A    No.

25       Q    Do you know whether Mr. Sweger and Graybill

1   received any field trips that you didn't receive?

2       A    No, I don't know that.

3       Q    Is there -- is what you're saying -- I want to make

4   it clear so I understand what your position is.  Your

5   position is that the wheelchair requirement and the loss of

6   runs was the pay off to the people that got wheelchairs

7   because they were taking runs away from you to help pay for

8   the wheelchairs -- wheelchair vans?

9       A    Would you say that again?

10      Q    There's two parts to your case in your complaint.

11  And the one part says that it was unfair, not rationally

12  related or whatever, to require the wheelchair vans, okay.

13           And then the other part is that you lost a run,

14  okay.  Do you claim there's a relationship between those two

15  items?

16      A    I think there's a relationship to them, yes.

17      Q    Okay.  Did anyone tell you that there was a

18  relationship between them?

19      A    No.

20      Q    Now, you testified with Mr. Russell that a third

21  party told you that they saw Mr. Morrison dropping run

22  sheets or whatever off in the IU unit that he was rejecting?

23      A    Yes.

24      Q    You never had any information that Mr. Sweger or

25  Mr. Graybill did that, did you?

1       A    No.

2       Q    And no one ever told you that they got to pick

3  their runs; is that correct?

4       A    No contractor.

5       Q    G & S, or Graybill and Sweger, you don't have any

6  information that they got to pick their own runs?

7       A    No.

8       Q    And you don't claim that they padded any of their

9  runs, do you?

10      A    I -- I really would have to see their route to see

11  if they did or not.

12      Q    In fact, you don't know very much at all about what

13  their routes are or what their runs are; is that correct?

14      A    I know --

15      Q    Other than the one that -- other than the one that

16  you took from him that you had the prior year?

17           MR. BAILEY:  Objection to the form of that

18  question.  A number of different times she has responded.

19  The assumption that she took any run is misplaced.  There

20  are no facts in evidence in support of that.  I object to

21  that language.  Move to strike.

22           MR. SCHIFFMAN:  Well, that was Mr. Graybill and

23  Sweger took the run is what the allegation is in the

24  complaint from her.

25           MR. BAILEY:  That's correct.

1          MR. SCHIFFMAN:  Okay.

2          MR. BAILEY:  But you referred to the run that she

3    took.

4          MR. SCHIFFMAN:  Well, if I said she took, then I

5    misspoke.  It was the run that they allegedly took from you.

6          MR. BAILEY:  Withdraw the motion to strike.  I

7    apologize.  I apparently misunderstood your question.

8          MR. SCHIFFMAN:  Let's just go on to a different

9    question, because I think we have the answer to that.

10         If you just give me 30 seconds of a break here so I

11   can talk to my clients, then I'll be finished.

12         MR. BAILEY:  Ladies and gentlemen, please be

13   advised that the equipment is still running even though

14   there's a brief break.

15         MS. LYDE:  It's 2:08 p.m.  We'll take a short

16   break.

17         (Discussion held off the record.)

18         MS. LYDE:  It's 2:11 p.m.  We're back on the tape.

19         MR. SCHIFFMAN:  I have no more questions of Mrs.

20   Beam at this time.

21   BY MR. ALTLAND:

22     Q    Okay.  My name is Dan Altland.  I represent Mr.

23   Morrison and his company.  I have a few questions for you.

24   With regard to your statement when Mr. Russell was

25   questioning you, I believe you said you never bought a

## CERTIFICATE OF SERVICE

I, Melanie L. Erb, Esquire, hereby certify that I have served a true and correct copy of the foregoing document by depositing such in the regular U.S. Mail, addressed as follows:

Don Bailey, Esquire
4311 N. Sixth Street
Harrisburg, PA 17110

P. Daniel Altland, Esquire
Mette, Evans & Woodside
3401 N. Front Street
Harrisburg, PA 17110

Stephen S. Russell, Esquire
Stock and Leader
Susquehanna Commerce Center East
6th Floor
221 W. Philadelphia Street
York, PA 17404

Melanie L. Erb, Esquire
Suite 201, 2080 Linglestown Road
Harrisburg, PA 17110
(717) 540-9170

Dated: January 21, 2003